# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

EMILY ORSAK and JULIE CHATAGNIER, on behalf of themselves and a class of all others similarly situated,

Plaintiffs,

v.

BEECH-NUT NUTRITION COMPANY,

Defendant.

Civil Action No. 1:21-cv-722 (TJM/CFH)

**COMPLAINT and
DEMAND FOR JURY TRIAL**

---

Plaintiffs Emily Orsak and Julie Chatagnier (collectively, "Plaintiffs") individually and on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendant Beech-Nut Nutrition Company ("Beech-Nut" or "Defendant") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

## **INTRODUCTION**

1.      On February 4, 2021, the United States House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("Subcommittee") published a report revealing that baby foods manufactured by some of the largest baby food manufacturers in the United States, including Defendant, are "tainted with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury" (the "Heavy Metals").[1]

---

[1] Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "Subcommittee Report") (February 4, 2021) at 2 (available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf) (last accessed May 20, 2021).

2.     The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared these Heavy Metals dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.[2] Even low levels of exposure can cause serious and often irreversible damage to brain development.[3]

3.     Baby food manufacturers hold a special position of public trust. Consumers believe that they would not sell products that are unsafe for babies to consume.

4.     Defendant does not disclose the Heavy Metal content of its Baby Food Products[4] on its labels or in its marketing materials.

5.     Defendant also failed to warn consumers that the Baby Food Products may contain potentially dangerous levels of Heavy Metals.

6.     Defendant markets, advertises, represents, and warrants that the Baby Food Products it manufactures, distributes, and sells, are safe and suitable for consumption by babies.

7.     As alleged herein, Defendant's marketing and advertising of its products is false, deceptive, and misleading to reasonable consumers because Defendant knows that Heavy Metals are harmful to babies and yet it sells the Baby Food Products nonetheless. Defendant's marketing and advertising of its products is also false, deceptive, and misleading to reasonable consumers because Defendant failed to warn and disclose material facts regarding the Baby Food Products, namely, that they were unsafe and unsuitable for babies; that they contained Heavy Metals; the levels of the Heavy Metals; that internal testing showed that its products contained harmful Heavy Metals; and that its internal policies permitted the sale of baby foods with harmful Heavy Metals.

---

[2] *Id.*

[3] *Id.*

[4] The term "Baby Food Products" refers to all products manufactured by Defendant that have been determined to contain Heavy Metals, whether through Defendant's own documents submitted to the Subcommittee or through independent testing.

8.     No reasonable consumer seeing Defendant's marketing and packaging would expect the Defendant's Baby Food Products to contain dangerous levels of Heavy Metals. Reasonable consumers, like Plaintiffs, would consider the inclusion of Heavy Metals or other toxins or contaminants a material fact when considering what baby food to purchase.

9.     Defendant's manufacture, distribution, and sale of the Baby Food Products were unlawful, unfair, false, and misleading, and Defendant was unjustly enriched at the expense of Plaintiffs and members of the proposed Classes, as defined below.

## **PARTIES**

10.    Plaintiff Emily Orsak is a resident and citizen of the state of Texas.  Between June 2020 and April 2021, Plaintiff Orsak purchased baby food manufactured by Defendant Beech-Nut, including, but not limited to: Beech-Nut Naturals Sweet Potato, Beech-Nut Naturals Apples, Beech-Nut Naturals Carrots, Beech-Nut Naturals Green Beans, Beech-Nut Naturals Pears, Beech-Nut Naturals Mango, Beech-Nut Naturals Apple and Blackberries, Beech-Nut Organics Apple, Raspberries and Avocado, Beech-Nut Naturals Pear and Blueberry, Beech-Nut Naturals Carrots, Sweet Corn, and Pumpkin, Beech-Nut Naturals Guava, Pear, and Strawberries, Beech-Nut Naturals Apple, Kiwi, and Spinach, Beech-Nut Naturals Mango, Apple, and Avocado, Beech-Nut Naturals Peas, Green Beans and Asparagus, Beech-Nut Naturals Beet, Pear, and Pomegranate, Beech-Nut Organics Pear, Kale, and Cucumber, Beech-Nut Naturals Sweet Corn and Green Beans, and Beech-Nut Naturals Apple, Pumpkin and Cinnamon.  Plaintiff Orsak purchased the baby food products from H-E-B and Walmart retail stores in Brenham, Texas. If Plaintiff Orsak had known that Defendant's baby food products were unsafe and unsuitable for babies and that testing showed that the products contained toxic Heavy Metals, Plaintiff Orsak would not have purchased the products or would have paid less for them.

11.    Plaintiff Julie Chatagnier is a resident and citizen of the state of Louisiana.  Between

December 2019 and August 2020, Plaintiff Chatagnier purchased baby food products manufactured by Defendant Beech-Nut including but not limited to Beech-Nut Naturals Banana, Beech-Nut Naturals Butternut Squash, Beech-Nut Naturals Green Beans, Beech-Nut Apples and Blueberries, Beech-Nut Garden Vegetables, Beech-Nut Naturals Sweet Corn and Green Beans, Beech-Nut Naturals Peas, and Green Beans, and Asparagus. Plaintiff Chatagnier purchased the products from Target retail stores in Covington and Hammond, Louisiana. If Plaintiff Chatagnier had known that Defendant's baby food products were unsafe and unsuitable for babies and that testing showed that its products contained harmful Heavy Metals, Plaintiff Chatagnier would not have purchased these products or would have paid less for them.

12.     Defendant Beech-Nut Nutrition Company is incorporated in Delaware and maintains its principal place of business at 1 Nutritious Pl., Amsterdam, NY 12010. Beech-Nut sells baby foods under the brand name Beech-Nut. Beech-Nut produces baby foods aimed at infants 4+ months up to 12+ months and includes a variety of cereals, jars, and pouches for these age groups. At all relevant times, Beech-Nut has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of its products within this judicial District.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from one Defendant.

14.     This Court has personal jurisdiction over Beech-Nut because Beech-Nut is headquartered in the state of New York, regularly conducts business in this District, and has extensive contacts with this forum.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District, and Defendant transacts substantial business in this District.

## PROCEDURAL HISTORY

16.     The instant action was originally filed as part of a multi-defendant complaint against defendants Hain Celestial Group, Inc. ("Hain"), Gerber Products Company ("Gerber"), Beech-Nut Nutrition Company ("Beech-Nut"), and Plum, PBC ("Plum") in the Eastern District of New York, Case No. 2:21-cv-02887-JS-AYS.

17.     Earlier this month, on June 7, 2021, the Judicial Panel on Multidistrict Litigation ("JPML") denied a motion for the centralization of related actions concerning the presence of heavy metals in baby foods against various defendants.

18.     After that decision was entered, counsel for Plaintiffs and Beech-Nut discussed the prospect of severing the claims against Beech-Nut and the corresponding transfer of those claims to the Northern District of New York, where a critical mass of substantially similar putative class actions are pending against Beech-Nut.

19.     To promote judicial economy and preserve resources – and to obviate the need for Beech-Nut to file motions to sever and transfer – Plaintiffs Orsak and Chatagnier agreed to dismiss their Eastern District of New York complaint against Beech-Nut and re-file their complaint against Beech-Nut in this Court.

## FACTUAL ALLEGATIONS

A.     **The Presence of Heavy Metals in Baby Foods**

20.     Baby food manufacturers are free to set their own internal standards for toxic heavy metal content of their products. They have set those standards at dangerously high levels and have often sold foods that exceed even those levels.

21.     In October 2019, Healthy Babies Bright Futures ("HBBF"), an alliance of nonprofit organizations, published a report detailing the evaluation of baby food products for the presence of heavy metals.[5]  The HBBF Report found that 95% of the 168 baby foods products tested were contaminated with one or more toxic heavy metals, including arsenic, lead, cadmium, and/or mercury (the "Heavy Metals").[6]  All but 9 products contained at least one metal, and 26% of the baby foods tested contained *all four* of the Heavy Metals. [7]

22.     The researchers who published the HBBF Report explained the harms these metals can cause. They explained that arsenic, lead, mercury, and cadmium, four heavy metals found in the Baby Food Products, are neurotoxins. Exposures to these four heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."[8] The Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[9] Even trace amounts of these heavy metals can alter the developing brain and erode a child's IQ. Arsenic causes potentially irreversible damage, including "cognitive deficits among school-age children exposed early in life, and neurological problems in adults who were exposed to arsenic-poisoned milk as infants."[10] According to the HBBF Report, research continues to confirm that exposure to

---

[5] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) ("HBBF Report"), available at: www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (last accessed May 10, 2021).
[6] *Id.* at 1.
[7] *Id.*
[8] *Id.* at 13.
[9] *Id.* at 6.
[10] *Id.* at 13

food containing arsenic, lead, mercury, and cadmium poses "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[11]

23.     The results of the HBBF Report were consistent with the FDA's 2017 investigation which found one or more Heavy Metal in 33 or 39 baby foods tested.[12]

24.     Despite the FDA's results, the FDA has failed to set enforceable limits or issue guidance on maximum safe amounts.[13]

**B.     A Congressional Report Also Found The Presence of Toxic Heavy Metals in Baby Food Products**

25.     As a result of the HBBF Report, on November 6, 2019, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform opened an investigation and requested documents and test results from seven of the largest baby food manufacturers in the United States.   The manufacturers included: (1) Gerber; (2) Nurture, Inc., which sells Happy Family Organics, including baby food products under the brand name HappyBABY;  (3) Beech-Nut; (4) Hain Celestial Group, Inc., which sells baby food products under the brand name Earth's Best Organic; (5) Campbell Soup Company, which sells baby food products under the brand name Plum Organics; (6) Walmart Inc., which sells baby food products through its private brand Parent's Choice; and (7) Sprout Foods, Inc., which sells food under the name Sprout Organic Food.

26.     Nurture, Beech-Nut, Hain, and Gerber responded to the Subcommittee's requests.[14] They produced their internal testing policies, test results for ingredients and/or finished products,

---

[11] *Id.* at 1.
[12] *Id.* at 6.
[13] *Id.*
[14] Subcommittee Report at 2.

and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits.[15]

27.     Sprout, Campbell (Plum Organics), and Walmart refused to cooperate with the government's investigation, to which the Congressional Subcommittee expressed "great concern[n] that their lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."[16]

28.     According to internal company documents and test results, and testing conducted by third-parties, the commercial baby foods manufactured by all seven companies were tainted with significant levels of Heavy Metals, including arsenic, lead, cadmium, and mercury.[17]

**a.     <u>Arsenic</u>**

29.     Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR").[18]  The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[19]

30.     Arsenic was present in baby foods made by all responding companies.

- Nurture (HappyBABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's

---

[15] *Id.*
[16] *Id.*
[17] Subcommittee Report at 2.
[18] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).
[19] Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/).

testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.

- Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

- Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."

- Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.[20]

**b.** **<u>Lead</u>**

31.     Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[21] Even at low levels, early childhood lead exposure has a negative impact on school performance and the cognitive effects of early childhood lead exposure appear to be permanent.[22] Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. According to FDA, lead is especially dangerous to "infants" and "young children."[23]

32.     Lead was present in baby foods made by all responding companies.

- Nurture (HappyBABY) sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.

- Beech-Nut used ingredients containing as much as 886.9 ppb lead. It used many ingredients with high lead content, including 483 that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead.

---

[20] Subcommittee Report at 3.
[21] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).
[22] Subcommittee Report at 11.
[23] *Id.*

- Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

- Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.[24]

**c.  Cadmium**

33.   Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[25] Cadmium is associated with decreases in IQ, as well as the development of ADHD.[26]

34.   Cadmium was present in baby foods made by all responding companies.

- Beech-Nut used 105 ingredients that tested over 20 ppb cadmium. Some tested much higher, up to 344.55 ppb cadmium.

- Hain (Earth's Best Organic) used 102 ingredients in its baby food that tested over 20 ppb cadmium. Some tested much higher, up to 260 ppb cadmium.

- Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium.

- Seventy-five percent of Gerber's carrots contained cadmium in excess of 5 ppb, with some containing up to 87 ppb cadmium.[27]

**d.  Mercury**

35.   Mercury is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[28]  Pre-natal mercury exposure has

---

[24] *Id.* at 3.
[25] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).
[26] Subcommittee Report at 12.
[27] *Id.* at 3-4
[28] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

been associated with adverse neurodevelopment and lower estimated IQ.[29]  Higher blood mercury

levels in 2- and 3-year-olds were associated with autistic behaviors.[30]

36.    Mercury was detected in baby food of the only responding company that tested for

it.

- Nurture (HappyBABY) sold finished baby food products containing as much as 10 ppb mercury.

- Beech-Nut and Hain (Earth's Best Organic) do not even test for mercury in baby food.

- Gerber rarely tests for mercury in its baby foods.[31]

37.    According to the Subcommittee Report, the levels at which these Heavy Metals are

present in baby food products are "multiples higher than allowed under existing regulations for

other products. For example, the FDA has set the maximum allowable levels in bottled water at

10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the Environmental Protection

Agency has capped the allowable level of mercury in drinking water at 2 ppb. The test results of

baby foods and their ingredients eclipse those levels: including results up to 91 times the arsenic

level, up to 177 times the lead level, up to 69 times the cadmium level, and up to 5 times the

mercury level."[32]

---

[29] Margaret R. Karagas et al., Evidence on the Human Health Effects of Low-Level Methylmercury Exposure (June 1, 2012) (online at https://ehp.niehs.nih.gov/doi/10.1289/ehp.1104494); Joseph Jacobson et al., Relation of Prenatal Methylmercury Exposure from Environmental Sources to Childhood IQ (Aug. 1, 2015) (online at https://ehp.niehs.nih.gov/doi/10.1289/ehp.1408554).

[30] Jia Ryu et al., Associations of Prenatal and Early Childhood Mercury Exposure with Autistic Behaviors at 5 Years of Age: The Mothers and Children's Environmental Health (MOCEH) Study (Dec. 15, 2017) (online at www.sciencedirect.com/science/article/pii/S0048969717316479).

[31] Subcommittee Report at 4.

[32] *Id.*

38.     As such, when baby food manufacturers are left to self-regulate and establish their own Heavy Metals standards, they routinely permit dangerously high levels of toxic heavy metals and often sell foods that exceeded even those levels.[33]

39.     In its conclusion, the Subcommittee stressed the danger associated with the presence of Heavy Metals in baby food: "[t]hese toxic heavy metals pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."[34]

## C.     Documented Dangers of the Heavy Metals in Baby Foods

40.     Baby food producers promote their product testing and safety procedures because parents and caretakers pay attention to what ingredients are in the baby food they purchase for their children.

41.     The findings in the HBBF Report and the Subcommittee Report are alarming because the FDA and the WHO have declared the Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[35] Babies' developing brains are "exceptionally sensitive to injury caused by toxic chemicals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity."[36] The fact that babies are small, have other developing organ systems, and absorb more of the heavy metals than adults, exacerbates their risk from exposure to heavy metals.[37]

---

[33] *Id.* at 33.
[34] *Id.* at 59.
[35] *Id.* at 1.
[36] *Id.* at 9 (quoting Philippe Grandjean and Philip J. Landrigan, Neurobehavioural Effects of Developmental Toxicity (Mar. 13, 2014) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC4418502/)).
[37] *Id.* (citing Consumer Reports, Heavy Metals in Baby Food: What You Need to Know (Aug. 16, 2018) (online at www.consumerreports.org/food-safety/heavy-metals-in-baby-food/)).

42.     Research continuously shows that exposure to food containing Heavy Metals causes "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[38] Specifically, Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[39]  Exposure to the Heavy Metals may cause permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children.[40]  These developmental conditions can be caused by exposure to even trace amounts of these substances.[41]

**D.     Defendant's Marketing Falsely Claims That The Baby Food Products Are Safe And Omits All Material Information About The Presence Of Heavy Metals**

43.     Despite the disturbing findings that Defendant's products contain Heavy Metals which can cause significant harm to babies and children, Defendant continues to advertise and warrant that its Baby Food Products are healthy, safe, and suitable for consumption by babies.

44.     On Beech-Nut's website, it claims that "Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority."[42] It further misleads consumers by representing that the company "conduct[s] over 20 rigorous tests on our purees, testing for up to 255 pesticides and heavy metals (like lead, cadmium, arsenic and other nasty stuff). Just like you would, we send the produce back if it's not good enough"[43]  However, as noted in the Subcommittee Report, Beech-Nut does not test for mercury, and has among the lowest standards in the industry for lead and cadmium.

---

[38] HBBF Report at 1.
[39] *Id.* at 6.
[40] Subcommittee Report at 9.
[41] HBBF Report at 1.
[42] https://www.beechnut.com/our-story/.
[43] *Id.*

45.     Beech-Nut's products' labels include a representation that the company does not use harmful ingredients such as cancer-causing bisphenol A ("BPA") but fails to disclose or warn consumers that Beech-Nut's products contain Heavy Metals. Instead, Beech-Nut maintains that its products are of the highest quality and fails to warn consumers of the dangers.

46.     Beech-Nut's packaging labels do not list, let alone warn, potential customers that its baby food products contain Heavy Metals.

47.     As alleged herein, Defendant's marketing and advertising of the Baby Food Products are false, deceptive, and misleading to reasonable consumers because Defendant knows that Heavy Metals are harmful to babies yet it sold, and continues to sell, products containing harmful Heavy Metals as evidenced by its own testing as well as independent testing.

48.     Defendant's marketing and advertising of its products is also false, deceptive, and misleading to reasonable consumers because Defendant failed to warn and disclose material facts regarding the Baby Food Products, namely, that they were unsafe and unsuitable for babies; that they contained Heavy Metals; the levels of the Heavy Metals; that its internal testing showed that its products contained Heavy Metals; and that its internal policies permitted the sale of baby food products with Heavy Metals. Defendant's distribution and sale of these products was unlawful, unfair, false, and misleading, and Defendant was unjustly enriched at the expense of Plaintiffs and Class members.

49.     Based on Defendant's decision to advertise and market the Baby Food Products as healthy and safe, Defendant had a duty to ensure that these statements were true and not misleading. As such, Defendant knew or should have known that the Baby Food Products included undisclosed and excessive levels of Heavy Metals, and that these toxins accumulate in the body over time.

50.     As a result of Defendant's misrepresentations and omissions, a reasonable consumer would have no reason to suspect the presence of Heavy Metals in the Baby Food Products without conducting his or her own scientific tests or reviewing third party scientific testing of these products.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Nationwide Class:

> All persons who purchased one or more of Defendant's Baby Food Products containing Heavy Metals, in the United States for personal/household use from the beginning of any applicable limitations period through the date of class certification. (the "Nationwide Class").

52.     Plaintiff Orsak brings this action individually and on behalf of the following Texas subclass:

> All persons residing in Texas who purchased the Beech-Nut Baby Food Products containing Heavy Metals for personal/household use from the beginning of any applicable limitations period through the date of class certification (the "Texas Subclass").

53.     Plaintiff Chatagnier brings this action individually and on behalf of the following Louisiana subclass:

> All persons residing in Louisiana who purchased Beech-Nut Baby Food Products containing Heavy Metals for personal/household use from the beginning of any applicable limitations period through the date of class certification (the "Louisiana Subclass").

54.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

55.    Numerosity (Rule 23(a)(1)): The exact number of members of the Class is unknown and currently unavailable to Plaintiffs, but joinder of individual members herein is impractical. The Class is likely comprised of thousands of consumers. The precise number of Class members, and their addresses, is unknown to Plaintiffs at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

56.    Predominant Common Questions (Rule 23(a)(2)): The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. The common and legal questions include, without limitation:

    a.    Whether the Defendant knew or should have known that its Baby Food Products contained Heavy Metals that rendered its Baby Food Products unsafe for babies;

    b.    Whether Defendant misleadingly represented and continues to represent that Baby Food Products are safe for babies' consumption;

    c.    Whether Defendant's representations, advertisements, warranties, labeling, packaging, and logos are false, deceptive, and/or misleading;

    d.    Whether Defendant had knowledge that those representations were likely to deceive a reasonable consumer;

    e.    Whether Defendant had knowledge that those representations were false, deceptive, and/or misleading;

    f.    Whether Defendant continues to disseminate those false, misleading, and/or deceptive representations;

    g.    Whether Defendant failed to warn and disclose material facts regarding the

Baby Food Products and concealed internal testing results revealing dangerous levels of Heavy Metals that are unsafe for babies;

h. Whether Defendant's testing showed that its products contained Heavy Metals;

i. Whether Defendant violated the state consumer protection statutes alleged herein;

j. Whether Defendant made negligent misrepresentations and/or omissions;

k. Whether Defendant breached its express warranties;

l. Whether Defendant breached its implied warranties;

m. Whether Defendant was unjustly enriched; and

n. The nature of relief, including damages and equitable relief, to which Plaintiffs and members of the Class are entitled.

57. Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of the claims of the Class because Plaintiffs, like all other Class Members, purchased Defendant's Baby Food Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class Members.

58. Adequacy of Representation (Rule 23(a)(4)): Plaintiffs adequately represent the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

59. Superiority (Rule 23(b)(3)): A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs

and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

60.     Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)): In the alternative, this action may properly be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendant; or the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or  Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
**(On behalf of Plaintiffs and the Nationwide Class (or alternatively, the Subclasses) against Defendant)**

61.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

62.     Defendant marketed and sold the Baby Food Products into the stream of commerce with the intent that the Baby Food Products would be purchased by Plaintiffs and the Nationwide Class.

63.     Defendant utilized false and deceptive product labels as well as advertising to promote, encourage, and urge the use, purchase, and utilization of the Baby Food Products by representing the quality and safety to parents and purchasers, Plaintiffs, and the public in such a way as to induce their purchase or use.

64.     For example, Defendant expressly warranted that its foods were safe for consumption by babies in a misleading manner, calling them, *inter alia*, "organic," "high quality," "safe," "nutritious," and "BPA-free."

65.     Through these representations, Defendant made express warranties that these foods would conform to the representations. More specifically, Defendant represented that these foods, when ingested by babies and children in the manner foreseen by Defendant, were safe and effective, that these foods were healthy and safe for consumption by babies.

66.     Defendant represented that the Baby Food Products only contained the ingredients disclosed on the label. These specific misrepresentations went beyond mere puffery as they were printed on the very product and in the product labeling.

67.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

68.     The Baby Food Products ingested by Plaintiffs' children did not conform to the representations made by Defendant, because these foods contained toxic levels of Heavy Metals and ingredients not safe for human ingestion in the manner intended by Defendant and contained ingredients not disclosed in the product labeling.

69.     Plaintiffs, by use of reasonable care, could not have discovered the breached warranty and realized the hidden increased risks and unreasonable dangers of allowing their

children to ingest these foods. Plaintiffs did not know of the presence of these toxins until after the release of the Subcommittee Report on February 4, 2021.

70. As a direct or proximate result of Defendant's conduct, Plaintiffs and the punitive Class have suffered actual damages in the purchase of the Baby Food Products that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of Heavy Metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial. Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendant's actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of its actions. By Defendant putting its own pecuniary interests ahead of all else, it sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food safe for consumption by babies and children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendant.

<u>**COUNT II**</u>
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On behalf of Plaintiffs and the Nationwide class (or alternatively, the Subclasses) against Defendant)**

71. Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

72. At all relevant times, Defendant was a merchant who dealt in goods of that kind, and in fact, boasted about its processes in production of safe and healthy baby food.

73. The baby foods at issue were not reasonably fit for the ordinary purposes for which such goods are used and did not meet the expectations for the performance of the product when

used in the customary, usual, and reasonably foreseeable manner. Nor were these products minimally safe for their expected purpose.

74. Unbeknownst to them, at the time the Plaintiffs purchased these baby foods, they contained toxic levels of Heavy Metals.

75. Plaintiffs did not know of the presence of the Heavy Metals until after the release of the Subcommittee Report on February 4, 2021.

76. The products at issue, even if they served their purpose in serving as food and sustenance for babies and children, cannot create a benefit of the bargain because the Heavy Metals, and their dangerous effects were never bargained for.

77. Because of the presence of these Heavy Metals, these products do create a present economic injury to Plaintiffs and the putative class because their sale should never have occurred.

78. As a direct or proximate result of Defendant's conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of Heavy Metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

79. Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendant's actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of its actions. By Defendant putting its own pecuniary interests ahead of all else, it sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food for their babies and children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendant.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiffs and the Nationwide Class (or alternatively, the Subclasses) against Defendant)**

80. Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

81. Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, manufacturing, marketing, distribution, and sale of its Baby Food Products.

82. Defendant breached its duty to Plaintiffs and the Class by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs and the Class that do not have the ingredients, qualities, characteristics, and suitability for consumption as advertised by Defendant and by failing to promptly remove the products containing Heavy Metals from the marketplace or to take other appropriate remedial action.

83. Defendant knew or should have known that the ingredients, qualities, and characteristics of the Baby Food Products were not as advertised or suitable for their intended use (consumption by babies) and were otherwise not as warranted and represented by Defendant.

84. Specifically, Defendant knew or should have known that: (1) its Baby Food Products at issue were not healthy, or safe for consumption because they contained or had a risk of containing levels of Heavy Metals; (2) the Baby Food Products were adulterated or at risk of being adulterated by Heavy Metals; and (3) the Baby Food Products were otherwise not as warranted and represented by Defendant.

85. Plaintiffs and the Class justifiably and reasonably relied on Defendant's representations as to the ingredients, qualities, and characteristics of the Baby Food Products.

86.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they have purchased Baby Food Products that is worth less than the price they paid and that they would not have purchased at all, had they known of the presence or risk of Heavy Metals that do not conform to the products' labels, packaging, advertising, and statements.

87.     Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**<u>COUNT IV</u>**
**UNJUST ENRICHMENT**
**(On behalf of the Plaintiffs and the Nationwide Class (or alternatively, the Subclasses)**
**against Defendant)**

88.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

89.     Plaintiffs and Class members conferred benefits upon Defendant. Plaintiffs and Class members paid money for Defendant's products containing Heavy Metals that were unsafe and not suitable for babies.

90.     Defendant has unjustly retained the benefits conferred upon by Plaintiffs and Class members. Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's Baby Food Products contain harmful Heavy Metals that render Defendant's products unsafe and unsuitable for consumption by babies. If Plaintiffs and Class members had known the true nature of Defendant's products, they would not have paid money for them or would have paid less. Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

**COUNT V**
**VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER**
**PROTECTION ACT ("TEXAS DTPA")**
**TEX. BUS. & COMM. CODE § 17.41, et seq.**
**(On behalf of the Texas Subclass against Defendant Beech-Nut)**

91.     Plaintiff Orsak hereby incorporates all other paragraphs of this Complaint and restate them as if fully set forth herein.

92.     Defendant Beech-Nut is a "person" under the Texas DTPA. TEX. BUS. & COMM. CODE § 17.45(3).

93.     The Texas DTPA proscribes false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.

94.     Defendant Beech-Nut engaged in false, misleading, and deceptive acts and practices in the conduct of trade and commerce by, inter alia, (1) representing that goods are of a particular standard, quality, or grade when they are of another; (2) advertising goods with the intent not to sell them as advertised; and (3) failing to disclose information concerning goods, which was known at the time of the transaction, and the failure to disclose such information was intended to induce Plaintiff Orsak and the Texas Subclass into a transaction into which they otherwise would not have entered had the information been disclosed.

95.     Specifically, Defendant Beech-Nut represented that its Baby Food Products are healthy, safe, and suitable for consumption by babies when the products actually contain dangerous levels of Heavy Metals which have a significant negative effect on neurodevelopment and central nervous system in children.

96.     Defendant Beech-Nut also advertised its Baby Food Products as healthy, safe, and suitable for consumption by babies with the intent not to sell them as advertised. Defendant Beech-Nut knew through its internal testing that the products it advertised and sold contained dangerous amounts of Heavy Metals at levels which exceeded its own internal standards, and every objective

standard, and which are not healthy or nutritious for children and pose serious and irreversible health risks to children who ingest them.

97.    Finally, Defendant Beech-Nut failed to disclose the fact that the Baby Food Products contained dangerous levels of Heavy Metals, which was known to Defendant at the time of the transactions through Defendant's self-testing of the products. Defendant's failure to disclose this material information was intended to induce Plaintiff Orsak and the Texas Subclass into purchasing Defendant's products. Defendant Beech-Nut knows that if it disclosed the amounts of Heavy Metals revealed by its self-testing to consumers, no consumer, including Plaintiff Orsak and the Texas Subclass, would buy the products because Heavy Metals are harmful to children's health and development, especially at the levels present in the Baby Food Products.

98.    Plaintiff Orsak and the Texas Subclass relied upon Defendant's advertising and labeling of the products to their detriment. Specifically, they relied upon Defendant's representations that the Products are safe, healthy, and suitable for consumption by babies. Their reliance was to their detriment because they purchased Defendant's products based upon these representations, but Defendant's products are actually dangerous to their children's health and development due to the excessive levels of Heavy Metals contained therein.

99.    Moreover, there can be no question that the Plaintiff Orsak and the Texas Subclass relied upon Defendant Beech-Nut's failure to disclose the presence of dangerous levels of Heavy Metals in its products, as no reasonable consumer would ever feed a child food that it knows contains dangerous amounts of Heavy Metals.

100.    It is inferred that the putative class members relied upon Defendant Beech-Nut's unlawful conduct, because the acts and omissions are common and consistent with respect to all putative class members and material in that they affect their children's health.

101.    Plaintiff Orsak and the Texas Subclass never would have purchased Defendant

Beech-Nut's products had the truth been known.

102.    Further, the Texas DTPA proscribes "any unconscionable action or course of action," which it defines as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COMM. CODE §§ 17.45(5), 17.50(a)(3).

103.    Defendant Beech-Nut's conduct in selling its Baby Food Products containing dangerous levels of Heavy Metals to Plaintiff Orsak and the Texas Subclass is an unconscionable action or course of action. Defendant Beech-Nut tested its products and knew that the products contained a dangerous level of Heavy Metals, but chose to take advantage of Plaintiff Orsak and the Texas Subclass's lack of knowledge of the presence of the Heavy Metals in the products they purchased to a grossly unfair degree.

104.    Defendant Beech-Nut's false, misleading, deceptive, and unconscionable acts are a producing and proximate cause of the economic damages sustained by Plaintiff Orsak and the Texas Subclass.

105.    Plaintiff Orsak and the Texas Subclass did not receive what they bargained for, in that Defendant Beech-Nut represented that the Baby Food Products were safe, healthy, and suitable for consumption by babies when, in fact, Defendant sold them products that contain dangerous amounts of Heavy Metals.

106.    Defendant Beech-Nut committed the acts violative of the Texas DTPA knowingly. The Subcommittee Report evidences the fact that Defendant Beech-Nut had actual awareness that the Baby Food Products it authorized for sale contained dangerous levels of Heavy Metals.

107.    Accordingly, Plaintiff Orsak and the Texas Subclass are entitled to their economic damages, in an amount to be determined at trial by a jury of their peers, their court costs and reasonable and necessary attorneys' fees, injunctive relief, and, because Defendant knowingly

violated the Texas DTPA, up to three times the amount of economic damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

a. Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

b. Awarding Plaintiffs and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c. Awarding Plaintiffs and the Classes appropriate relief, including but not limited to actual damages;

d. For declaratory and equitable relief, including restitution and disgorgement;

e. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f. Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

g. Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

h. Awarding pre-judgment and post-judgment interest;

i. For punitive damages; and

j. Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: June 21, 2021

**LEVI & KORSINSKY, LLP**

By: s/ Mark S. Reich_____
Mark S. Reich
Courtney E. Maccarone (*pro hac vice to be filed*)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mreich@zlk.com
        cmaccarone@zlk.com

*Counsel for Plaintiffs*